**GEORGE S. CANELLOS**
**REGIONAL DIRECTOR**

**09 CV 6939**

**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**3 World Financial Center**
**New York, NY 10281-1022**
**(212) 336-0174**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | 09 Civ. _____ (   ) |
| -against- | : | |
| | : | |
| MAURICE R. GREENBERG and | : | |
| HOWARD I. SMITH, | : | **COMPLAINT** |
| Defendants. | : | |
| | : | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Maurice R. Greenberg and Howard I. Smith (collectively, "Defendants"), alleges as

follows:

## SUMMARY OF ALLEGATIONS

1.    From at least 2000 until 2005, Maurice R. Greenberg, the former chairman and

chief executive officer of American International Group, Inc. ("AIG"), and Howard I. Smith,

AIG's former chief financial officer, directed several different accounting transactions to

materially affect AIG's reported financial results.  The transactions affected multiple reporting

periods and one of them did not conclude until 2005, when Greenberg and Smith left the

company.

2.       Greenberg publicly described AIG as the leader in the insurance and financial services industry with a history of delivering consistent double-digit growth in key financial performance measures.  Investors rewarded AIG for this consistency by trading the stock at a premium compared to the company's competitors.  In reality, AIG under Greenberg faced a number of financial challenges that, had they been properly reported or accounted for, would have exposed significant missteps in AIG's operations and caused the company to miss certain key earnings and growth targets.  Greenberg, as a control person of AIG, and Smith, as AIG's chief financial officer, were aware of transactions that enabled AIG to create the false impression that it consistently met or exceeded expectations for these key financial measures, and Smith knew or recklessly disregarded that AIG's accounting for these transactions was not in conformity with generally accepted accounting principles ("GAAP").

3.       The three primary areas of fraud were:  (1) transactions with General Re Corporation ("Gen Re") in which AIG purportedly increased its loan loss reserves; (2) transactions with Capco Reinsurance Company Ltd. ("Capco"), a special purpose entity AIG created and used to conceal underwriting losses by converting them improperly to capital losses; and (3) transactions to misstate net investment income or capital gains.

4.       **The Gen Re Transactions.**  In 2000, after analysts criticized AIG for its declining loss reserves and investors punished the stock, Greenberg initiated two reinsurance transactions with a foreign subsidiary of General Re Corporation ("Gen Re").  By accounting for them improperly as real reinsurance, AIG falsely reported increases to both loss reserves and premiums written.  These two key performance measures remained inflated in AIG's financial statements until its 2005 restatement.  Smith, as AIG's chief financial officer, knew or recklessly disregarded that AIG's accounting for these transactions as reinsurance was not in conformity

2

with GAAP and Greenberg publicly described the purported improvement in reserves. The transactions had no economic substance, amounting to a round trip of cash, but they were designed to, and did, have a specific and false accounting effect. Without the phony loss reserves added to AIG's balance sheet, AIG's reported loss reserves would have been $250 million less in the fourth quarter of 2000 and an additional $250 million less in the first quarter of 2001.

5.     During the period when AIG's financial results were misstated as a result of the phony loss reserves added to its balance sheet, AIG distributed its stock in connection with its August 29, 2001 acquisition of American General Corporation ("American General") to American General stockholders. Greenberg and Smith signed a registration statement for this distribution that incorporated by reference AIG financial statements containing the phony loss reserves.

6.     **The Capco Transactions.** Underwriting was AIG's core business. When AIG's auto warranty underwriting business was suffering in 2000, AIG was facing projected losses of approximately $210 million. Instead of reporting these underwriting losses, Greenberg initiated and approved a reinsurance transaction with Capco, an offshore shell company funded and controlled by AIG, to inaccurately re-characterize and report the underwriting losses as capital losses. Capital losses were less troublesome to investors because they viewed them as not relating to AIG's core business. To avoid consolidation of the shell company on AIG's financial statements, Greenberg proposed finding purported investors for the shell company through a contact in Switzerland, and Smith approved funding by AIG of non-recourse loans to the investors to pay for their purported investment. Smith also approved AIG's accounting for the transactions. Greenberg and Smith then approved as AIG spread the impact of the capital losses

3

over several reporting periods. By using Capco to convert improperly the underwriting losses to capital losses, AIG materially overstated its adjusted underwriting profits for its general insurance operations in 2001 by over 100 percent (or 11 percent excluding the losses associated with the World Trade Center attacks that year).

7.     **Transactions to Misstate Net Investment Income or Capital Gains.** Smith also knew about or recklessly disregarded AIG's improper accounting for three sets of transactions that enabled AIG to manufacture and report improper gains that were material to AIG's financial statements. Two of these transactions, one involving covered calls and the other involving hedge fund investments, resulted in AIG's improper recognition of the unrealized appreciation on its investment portfolio as general insurance net investment income ("NII"), one of AIG's key financial barometers, and the third set of transactions resulted in understatements of AIG's reported capital losses. Greenberg made materially inaccurate public statements relating to at least two of the sets of transactions in 2002.

8.     In the economically senseless covered calls transactions during 2001, AIG recognized as NII the unrealized appreciation in AIG's municipal bond portfolio without actually selling or otherwise extinguishing AIG's ownership interest in those bonds. Smith knew or recklessly disregarded that AIG's accounting for the covered calls transactions was not in conformity with GAAP. As a result, AIG's financial statements overstated NII for its general insurance segment by $60 million or 9 percent for the third quarter of 2001; by $86 million or 13 percent for the fourth quarter of 2001; and by $146 million or 5.3 percent for the 2001 fiscal year.

9.     During 2001, Smith knew about or recklessly disregarded AIG's improper accounting in connection with another set of transactions to overstate reported NII. These

4

transactions were designed to "harvest" unrealized gains in AIG's hedge fund investments without relinquishing AIG's financial interest in the hedge funds. As part of these hedge fund transactions, Smith directed AIG to enter into round trip transactions in which AIG appeared to redeem a portion of its interest in certain hedge funds back to the hedge funds, recorded the resulting cash payment from the funds as net investment income, and agreed at the time of the purported redemption to return the cash payment to the hedge funds, thereby simultaneously re-establishing AIG's interest in the fund. In at least one of these instances, Smith approved a loan of cash from AIG to a hedge fund so that the fund could distribute the same amount of money back to AIG. As a result of the hedge fund transactions, AIG overstated NII for its general insurance segment by $104 million or 17.3 percent for the second quarter of 2001; by $133 million or 22.5 percent in the third quarter of 2001; and by $165 million or 6.1 percent for the 2001 fiscal year.

10.      A similar deceptive set of transactions falsified AIG's capital gains. In these transactions, which began in 2000 and affected reporting periods during 2001, Smith approved AIG's transfer of certain municipal bonds from its investment portfolio to municipal tender option bond trusts ("Muni Tobs") that AIG controlled, improperly recorded capital gains from the transfer, caused the trusts to be extinguished, then re-acquired the same bonds that AIG had temporarily placed in the trusts. As a result of the Muni Tobs transactions, AIG understated its reported realized capital losses for its general insurance segment by $46 million or 55.5 percent in the second quarter of 2001, by $83 million or 48 percent in the third quarter of 2001; and by $205 million or 61.3 percent for the 2001 fiscal year.

11.      With respect to these three matters, Smith knew or recklessly disregarded that AIG's accounting for them was not in conformity with GAAP and he is liable for the material

misstatements in AIG's financial statements resulting from them. Greenberg, who knew about the effects of these transactions on AIG's reported financial results, is liable, as a control person, with Smith for false and misleading public statements and material omissions in press releases, investor conference calls and in AIG's Forms 10-Q relating to the impact of two of them, the covered calls and the hedge fund transactions, on the reasons for the reported decline in AIG's NII in the second and third quarters of 2002.

12.     In 2005, AIG restated its prior accounting for these and other matters. In its restatement, AIG admitted not only that its accounting for certain transactions had been improper, but also that the purpose behind those transactions was to show improvements in financial measurements that the company believed were important to the market. AIG conceded in its restatement that certain transactions may have "involved documentation that did not accurately reflect the true nature of the arrangements ... [and] misrepresentations to members of management, regulators and AIG's independent auditors." AIG's restatement shaved approximately $2.26 billion from shareholders' equity as of December 31, 2004, and exposed an overstatement in AIG's retained earnings of 10 percent through December 31, 2003.

## VIOLATIONS

13.     By their conduct, Greenberg and Smith are liable as control persons for AIG's violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78(m)(b)(2)(A), and 78(m)(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13]. By his conduct, Smith violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and

6

78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2].

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] seeking a final judgment: (i) permanently enjoining the defendants from violating and/or from controlling any person who violates certain specified provisions of the federal securities laws; (ii) requiring Greenberg and Smith to disgorge any ill-gotten gains; (iii) imposing civil money penalties against Greenberg pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and against Smith pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and (iv) barring Smith from serving as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] for a period of three years from the date of entry of the final judgment.

15.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

16.     Venue lies in the Southern District of New York, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa]. AIG's principal corporate offices are located in New York, New York.

17.     Defendants, directly or indirectly, singly or in concert, have made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the

transactions, acts, practices, and courses of business alleged herein.  Certain of these
transactions, acts, practices, and courses of business occurred in the Southern District of New
York.

## THE DEFENDANTS

18.     **Maurice R. "Hank" Greenberg,** age 84, is a resident of New York, New York.
At all relevant times, Greenberg was a person who controlled AIG, and he was the chairman of
AIG's board of directors and chief executive officer.  Greenberg joined AIG in 1960 and became
chief executive officer in 1967.  In 1989, he also became Chairman.  On March 14, 2005, AIG's
board of directors required Greenberg to step down from his position as chief executive officer.
Although the AIG board permitted Greenberg to remain non-executive chairman of AIG, he
resigned from that position on June 8, 2005.

19.     **Howard I. Smith,** age 64, is a resident of Woodbury, New York.  At all relevant
times Smith was AIG's chief financial officer and a member of AIG's board of directors.  AIG
terminated his employment on or about March 22, 2005.  Smith formerly was an audit partner at
a major accounting firm.  At all relevant times, Smith was a certified public accountant.

## OTHER RELEVANT ENTITIES

20.     **AIG,** a Delaware corporation, is a holding company that, through its subsidiaries,
is engaged in a broad range of insurance and insurance-related activities in the United States and
abroad.  AIG's common stock is registered with the Commission pursuant to Section 12(b) of the
Exchange Act and is listed on the New York Stock Exchange.  On February 9, 2006, the
Commission filed a complaint against AIG in this Court (No. 06 CV 1000) alleging, among other
things, that AIG violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-
5.  Without admitting or denying the allegations of the complaint, AIG consented to a final

8

judgment that, among other things, permanently enjoined it from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]. The Court entered the consent judgment on February 17, 2006.

21.     **Gen Re** is a Connecticut corporation with its principal corporate offices located in Stamford, Connecticut. Gen Re is a holding company for global reinsurance and related risk assessment, risk transfer, and risk management operations. Gen Re became a wholly owned subsidiary of Berkshire Hathaway, Inc. on December 21, 1998. Berkshire Hathaway's Class A and Class B common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the New York Stock Exchange.

22.     **Capco** was a Barbados reinsurer and shell company that AIG, through a subsidiary, recapitalized for use as a special purpose entity. Capco was liquidated in 2002.

## FACTS

## I.     Transactions to Create the Appearance of Increased Loss Reserves

23.     On October 26, 2000, AIG issued its third quarter earnings release showing an approximate $59 million decline in general insurance reserves.

24.     This reduction in general insurance reserves drew criticism from certain analysts. For example, one analyst wrote: "One concern over the past several quarters has been reserve growth, which has been minimal or even has declined in certain quarters. There has been concern that AIG is releasing reserves to make its numbers." Other analysts voiced similar concerns.

25.     At least two analysts downgraded AIG after the earnings release.

26.     Following AIG's third quarter 2000 earnings release, issued on October 26, 2000, AIG's stock price dropped 6%.

9

27.     Greenberg was unhappy about these developments. Just a few days later, on approximately October 31, 2000, Greenberg called Gen Re's chief executive officer to propose a transaction whereby Gen Re would transfer $200 million to $500 million of loss reserves to AIG by year-end. He wanted the transfer of loss reserves to be short term, for six to nine months. Greenberg later said that he wanted the portfolio to contain "long-tailed lines," which means that if any losses had to be paid, they would be paid in later years – well after the anticipated life of the transaction.

28.     In conversations regarding this proposed transaction, Greenberg made it clear that he wanted a transaction that increased AIG's reserves, but which would have no net impact on AIG's income statement.

29.     But obtaining additional loss reserves was not possible because Greenberg did not want to have any negative impact on AIG's income statement. For the transaction to have the desired effect on AIG's loss reserves, it had to qualify as reinsurance, and this means that it had to involve a transfer of risk to AIG.

30.     Smith knew about the proposed Gen Re transaction and followed up to ensure that what Greenberg wanted was being done. Smith also was involved in the decision to structure the Gen Re deal as two transactions. He was aware of the details of the transactions and knew or recklessly disregarded that no underwriting analysis was done in connection with the deal. Smith also was involved in structuring and executing side agreements to conceal that AIG, through a subsidiary, was paying a $5 million fee to Gen Re to compensate Gen Re for executing the transactions and that AIG was refunding a $10 million purported premium that Gen Re, through its offshore subsidiary, paid to AIG. Smith also approved reinsurance accounting for the

10

transactions although he knew, or recklessly disregarded, that such accounting was not in conformity with GAAP.

## A.    The Sham Reinsurance Transactions

30.    Greenberg assigned an AIG senior executive to structure the deal with Gen Re. Gen Re's chief executive officer turned to several Gen Re senior executives, including Gen Re's chief financial officer, to work out the details of the transaction.

31.    AIG and Gen Re then fashioned two contracts between National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), an AIG subsidiary, and Cologne Re Dublin ("CRD"), a Dublin, Ireland-based subsidiary of a Gen Re subsidiary. These purportedly were retrocession contracts, or contracts in which a reinsurer cedes to another reinsurer all or part of a reinsured risk it previously assumed – in other words, reinsurance of reinsurance.

32.    The contracts show reinsurance transactions that appeared to transfer risk to AIG, but the transactions did not transfer risk. On the face of the contracts National Union appeared to assume $100 million of risk over and above the $500 million in premiums CRD was obligated to pay, but this extra $100 million of risk was pure fiction added to make it appear that the contracts transferred risk to National Union. In fact, National Union assumed no risk and CRD incurred no premium liability. Of the $500 million in premiums set forth in the contracts, $490 million was on a "funds withheld" basis (*i.e.*, the money was never paid to National Union but was retained by CRD). CRD was supposed to pay the remaining $10 million to National Union according to the contracts, but AIG "prefunded" the $10 million to CRD in what amounted to a round trip of cash in a side deal that was not reflected in the contracts.

33.    The purported reinsurance transactions had no real economic substance. The sole purpose of the transactions was to manipulate AIG's financial statements. AIG paid Gen Re a

11

$5 million fee for putting the deal together – a side deal not reflected in the contracts. Moreover, a phony paper trail was concocted to create the false appearance that Gen Re had solicited the reinsurance from AIG when in fact Greenberg had solicited it from Gen Re.

34.     These contracts became the vehicle for fraudulently adding loss reserves to AlG's financial statements. Without the phony loss reserves added to AIG's balance sheet and described in its earnings releases, AlG's earnings releases would have shown continued reductions in loss reserves for the fourth quarter of 2000 and the first quarter of 2001, instead of $500 million of additional loss reserves.

## B.     Reinsurance Accounting Principles

35.     Had this been real reinsurance involving a real transfer of risk, it would have been permissible under GAAP for AIG to record reserves in the amount of the loss that was probable and reasonably estimable. Under Statement of Financial Accounting Standards ("SFAS") No. 113, *Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts,* a reinsurer may record a loss reserve pertaining to a reinsurance contract only when the reinsurer is assuming significant insurance risk (underwriting and timing risk) and it is reasonably possible that the reinsurer may realize a significant loss for the transaction.

36.     When there is insufficient risk transfer, a transaction may not be treated as insurance for GAAP purposes, but rather must be accounted for using the deposit method, which has no effect on loss reserves. Deposit accounting simply reflects that one party owes funds to another party. Thus, in this case, deposit accounting would have shown merely that AIG received a loan from Gen Re and would not have increased AIG's loss reserves.

37.     AIG's contracts with Gen Re, through their subsidiaries National Union and CRD, were not real reinsurance contracts, because AIG assumed no risk.

12

38.     Because the transactions had no substance, AIG should not have increased its

reserves at all. At best, AIG should have recorded the transactions as deposits on its books – *i.e.*,

as money owed to Gen Re – which would have had no effect on AIG's reserves.

## C.     Materially False Statements Resulting From the Gen Re Transactions

39.     By accounting for the contracts as if they were real reinsurance, AIG inflated its

loss reserves by $250 million in 2000 and an additional $250 million in 2001, and its premiums

by $250 million in both 2000 and 2001. Without the phony loss reserves added to AIG's balance

sheet, AIG's reported loss reserves would have been $250 million less in the fourth quarter of

2000 and $500 million less in the first quarter of 2001. In other words, but for the phony loss

reserves, AIG would have reported declining loss reserves for three consecutive quarters,

including the decline in the third quarter of 2000 that prompted Greenberg to initiate the

transaction.

40.     The sham loss reserves remained in AIG's periodic reports filed with the

Commission until AIG's 2005 restatement which restated AIG's financial statements through

December 31, 2004. The first contract was terminated in November 2004, thus decreasing

AIG's loss reserves by $250 million. The restatement decreased AIG's loss reserves by the

remaining $250 million as the result of the use of deposit accounting for the remaining contract,

which was eventually cancelled by Gen Re on August 1, 2005.

41.     Specifically, materially inflated loss reserve amounts appear in AIG's Forms 10-

K for the years ended December 31, 2000 (signed by Greenberg and Smith and filed on April 2,

2001), December 31, 2001 (signed by Greenberg and Smith and filed on April 1, 2002),

December 31, 2002 (signed and certified by Greenberg and Smith and filed on March 31, 2003),

and December 31, 2003 (signed and certified by Greenberg and Smith and filed on March 15,

13

2004), and in AIG's Forms 10-Q for the quarters ended March 31, 2001 (signed by Smith and filed on May 15, 2001), June 30, 2001 (signed by Smith and filed on August 14, 2001), September 30, 2001 (signed by Smith and filed on November 14, 2001), March 31, 2002 (signed by Smith and filed on May 15, 2002), June 30, 2002 (signed by Smith, certified by Greenberg and Smith, and filed on August 8, 2002), September 30, 2002 (signed by Smith, certified by Greenberg and Smith, and filed on November 14, 2002), March 31, 2003 (signed by Smith, certified by Greenberg and Smith, and filed on May 14, 2003, and a subsequent amended Form 10-Q for this quarter containing the materially inflated amounts also was signed by Smith, certified by Greenberg and Smith, and filed on July 18, 2003), June 30, 2003 (signed by Smith, certified by Greenberg and Smith, and filed on August 14, 2003), September 30, 2003 (signed by Smith, certified by Greenberg and Smith, and filed on November 14, 2003), March 31, 2004 (signed by Smith, certified by Greenberg and Smith, and filed on May 10, 2004), June 30, 2004 (signed by Smith, certified by Greenberg and Smith, and filed on August 9, 2004), and September 30, 2004 (signed by Smith, certified by Greenberg and Smith, and filed on November 9, 2004).

42.    In addition, on February 8, 2001 AIG issued its fourth quarter 2000 earnings release, which Greenberg and Smith reviewed beforehand, and Greenberg approved its issuance. The release reflected the impact of the first Gen Re contract. The release quoted Greenberg, who described the increased loss reserves as follows: "AIG had a very good quarter and year.... We added $106 million to AIG's general insurance net loss and loss adjustment reserves for the quarter, and together with the acquisition of HSB Group, Inc., increased the total of those reserves to $25.0 billion at year-end 2000." This statement was materially inaccurate because

14

the $106 million increase to reserves in AIG's fourth quarter 2000 earnings release in reality was a $144 million decrease in reserves.

43.    Market analysts reacted favorably to the added apparent reserves. For example, one analyst report opined: "We think this quarter was a good example of AIG doing what it does best: growing fast and making the numbers.... As important was the change in reserves: AIG added $106 million to reserves and the paid/incurred ratio fell to 97.1 percent, the lowest level since the first quarter of 1999."

44.    On April 26, 2001, AIG issued its first quarter 2001 earnings release, which Greenberg and Smith reviewed beforehand, and Greenberg approved its issuance. The release reflected the impact of the second Gen Re contract. Greenberg again described AIG's additions to its loss reserves: "AIG had a solid first quarter.... We added $63 million to AIG's general insurance net loss and loss adjustment reserves for the quarter, bringing the total of those reserves to $25.0 billion at March 31, 2001." This statement was materially inaccurate because the transactions that resulted in the reported increase in reserves did not transfer risk to AIG. The $63 million increase in reserves reported in AIG's first quarter 2001 earnings release was in reality a $187 million decrease in reserves that the transactions with Gen Re concealed.

45.    Once again, analysts reacted favorably to the apparently added reserves. For example, an analyst report commented: "Net loss reserves increased by $63 million. Given the renewed premium growth we would expect reserves to continue rising at an accelerating pace, especially since the growth is coming in the longer-tail commercial lines business." Another report said, "Net loss reserves only increased $63 million, but we are not concerned about this level of growth and it is not inconsistent with industry trends at this point in the cycle."

15

46.     Greenberg and Smith signed the 2001 management representation letter to AIG's external auditors. This letter, dated February 6, 2002, contained material misrepresentations concerning the Gen Re transactions, including representations that "insurance and reinsurance contracts not transferring risk" were properly accounted for as deposits and that all reinsurance contracts were properly accounted for, even though the Gen Re transactions did not transfer risk and were improperly accounted for as reinsurance.

## D.     Fraudulent Offering

47.     In connection with its acquisition of American General and its distribution of shares to American General shareholders, AIG filed a registration statement on Form S-4 on June 8, 2001, which incorporated by reference AIG's Form 10-K for 2000 and its Form 10-Q for the first quarter of 2001. Both of these periodic reports contain loss reserve amounts that were fraudulently inflated by the Gen Re transactions. Both Greenberg and Smith signed this Form S-4. The form contained materially inaccurate statements concerning the Gen Re transactions.

## II.     Concealment of Underwriting Losses

48.     Greenberg and Smith became aware by late 1999 that the underwriting results of AIG's auto warranty business were seriously deteriorating and that the business was expected to sustain approximately $210 million in underwriting losses over coming years. Underwriting losses in this area were particularly disappointing to Greenberg because his son, whom he was grooming as his replacement, had steered AIG into the auto warranty business a few years earlier. AIG priced its warranties too cheaply, failed to keep a tight rein on commissions, and experienced other problems with the business, which resulted in these large anticipated underwriting losses.

49.     Because Greenberg and Smith considered $210 million in losses to be large, they explored ways to lessen the reported impact on AIG's reported underwriting results. Initially,

16

Smith suggested that AIG could swap the auto underwriting losses for securities having unrealized losses owned by an unrelated third party. At the time he made his suggestion, Smith requested that discussion of this deal should be limited to as few people as possible.

50. Smith's initial suggestion did not come to fruition. Instead, he directed an AIG official to create a structure to convert the $210 million in underwriting losses to capital losses. The official, who was president of an AIG subsidiary, AIG Reinsurance Advisors, and a senior accountant and deputy controller at AIG, kept Greenberg and Smith informed about the plan as it progressed. Although the AIG official devised the structure of the transactions, Smith remained aware of the structure and directed the official to execute the plan to improperly convert the underwriting losses to capital losses.

51. To accomplish the concealment, AIG entered into a series of transactions with Capco, a Barbados reinsurer. Capco was a shell company that AIG took over from another insurance company and recapitalized as a special purpose entity when an AIG subsidiary, American International Reinsurance Company, Ltd. ("AIRCO"), became Capco's preferred shareholder. AIG ceded the underwriting losses through another AIG subsidiary, depleting Capco's capital. In turn, AIRCO recognized capital losses on the sale of its investment in Capco. The AIG official who, the Defendants knew, was devising the Capco structure explained the complicated transaction to Greenberg and Smith, warning them in an April 20, 2000 memo that the accounting would be "aggressive."

52. To avoid consolidation of Capco on AIG's books in conformity with GAAP, AIG needed third-party investors to contribute at least 3 percent of Capco's capital. Emerging Issues Task Force ("EITF") Issue No. 90-15, *Impact of Nonsubstantive Lessors, Residual Value*

17

*Guarantees, and Other Provisions in Leasing Transactions,"* (1991), required an at risk substantive equity investment of a minimum of 3 percent to avoid consolidation.

53.    Since Capco was being formed to absorb approximately $210 million in losses, it would be difficult to find investors willing to make the necessary capital investment. For this reason, the AIG official who devised and implemented the Capco structure proposed to Greenberg and Smith in his April 20, 2000 memo that AIG finance the investors' capital contribution with a promissory note with recourse only to the investors' Capco common shares. In other words, the investors would not really contribute any capital and they would bear no risk.

54.    In a meeting between the AIG official and Greenberg and Smith, Greenberg directed the AIG official to contact the chief executive officer of AIG Private Bank in Switzerland for assistance in finding investors willing to purchase Capco's common shares. The AIG official went to Switzerland and, with the help of the bank's chief executive officer, found three individuals whom he solicited to act as purported investors. The AIG official obtained the approval of Greenberg or Smith for the particular investors he located in Switzerland.

55.    AIG loaned the three individual investors approximately $19 million for their investment. At Smith's suggestion, the money was routed to the purported investors through an AIG subsidiary different from AIRCO, the subsidiary that would invest in Capco. AIG therefore invested $19 million in AIG Capital Corporation ("AIGCC"), a European subsidiary, for transfer to another subsidiary that would, in turn, lend the money on a non-recourse basis to the three investors for their purchase of Capco's common shares. Lending the funds to the investors in this indirect way through AIGCC helped to conceal the fraud by making it less likely that AIG's auditors would learn about the financing.

18

56.     The loans to the investors were a sham. Because the investors had no personal liability on the loans, the only recourse was to the Capco common shares, which would become worthless at the moment AIG ceded its auto warranty losses to Capco. In addition, the investors paid no interest on the loans. On the contrary, AIG paid the investors for entering into the transactions.

57.     AIG also did not directly purchase the preferred shares of Capco. Instead, AIG invested $170 million in AIRCO and AIRCO, in turn, invested in 8,500 Capco preferred shares.

58.     AIG, through its subsidiary, National Union, entered into a reinsurance agreement with Capco whereby National Union would cede up to $210 million of losses to Capco in exchange for a premium of $20 million. This agreement allowed AIG to cede its auto warranty losses to Capco and to offset those losses with purported reinsurance recoverables.

59.     AIG, through the $19 million provided to the three investors, the $170 million purchase of Capco preferred shares, and the $20 million premium paid on the reinsurance contract with Capco, provided Capco with $209 million in capital – approximately equaling the expected $210 million in auto warranty losses. By the end of 2002, AIG ceded approximately $201 million in losses to Capco.

60.     In order for AIG to complete the conversion of the underwriting losses into capital losses – which was the reason for creating Capco – AIG needed to sell its Capco preferred shares periodically. Thus, in the fourth quarter of 2000, AIG (through its subsidiary AIRCO) entered into a sham transaction with a third-party insurance company, which appeared to purchase 1,600 of AIG's 8,500 preferred shares in Capco for $2 million (the cost basis of the shares sold was $32 million). There were no negotiations concerning this purported "sale" and the purported purchaser immediately sold the preferred shares back to Capco for the same

19

$2 million (plus fee). On the basis of this supposed "sale," AIG recorded a realized capital loss of $30 million (through AIRCO).

61.    In the second and third quarters of 2001, AIG (through AIRCO) did not repeat the same sham sale of preferred shares. Instead, AIG simply accrued losses on its investment in Capco by $33 million each quarter with no transaction to justify the amount. Then, in the fourth quarter of 2001, AIG entered into another sham transaction with the same third-party insurance company with which it had entered into the phony sale of preferred Capco shares as in the fourth quarter of 2000. This time, the insurer agreed to purchase 3,400 of AIG's preferred shares in Capco for $2 million (the cost basis of the shares sold was $68 million), purportedly allowing AIG to "realize" the $66 million in losses it had previously and improperly accrued. Again there were no negotiations concerning this supposed "sale," and the third-party insurer promptly sold the preferred shares back to Capco for the same $2 million. The third-party insurer retained a $10,000 fee for engaging in the transactions.

62.    AIG purportedly sold 1,600 Capco preferred shares in 2000 for $2 million and another 3,400 Capco preferred shares in 2001, also for $2 million, making it appear that the per share fair value of the preferred shares had declined from $1,250 per share to $588 per share. But the Capco preferred shares had no real value at all because the purported sales were shams designed to achieve AIG's goal of converting underwriting losses to capital losses. Smith knew or recklessly disregarded that AIG had no basis under GAAP to recognize capital losses from the purported sales of the Capco preferred shares. But even assuming that the purported sales of the preferred shares had any legitimacy, GAAP would have required AIRCO to book an unrealized loss for the remaining value of the Capco preferred shares that it did not sell. SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities,* ¶ 16, requires that where the

20

decline in fair value of a security is "judged to be other than temporary," the cost basis of the security is written down to the fair value and the amount of the write down is included in earnings. Smith, however, directed AIRCO not to record the unrealized loss.

63.    AIRCO officials later sent Smith an email raising concerns about Smith's instruction not to record the unrealized loss. Smith responded in a phone call in which he admonished the AIRCO officials for sending the email and directed them to destroy all evidence of it.

64.    Because AIG financed the third-party investors' investments in Capco and the investors bore no risk, GAAP required AIG to consolidate Capco into its financial statements. Consolidating Capco would have required AIG to report the underwriting losses in the periods in which they were incurred.

65.    Notwithstanding the requirements of GAAP, AIG did not consolidate Capco's financial results in AIG's financial statements until the company's restatement in 2005.

66.    Smith approved the fraudulent Capco transactions and took specific steps to implement them, including approving the structure, the financing, and the accounting. In particular, on or about August 11, 2000, Smith authorized AIRCO to execute the purchase of preferred shares of Capco for $170 million. Smith approved the funding for the loans to the purported investors on or about August 16, 2000 when he signed and wrote "OK" on a printout of an email stating that $19 million should go to AIGCC. On or about August 18, 2000, Smith approved the transfer of $170 million from AIG to AIRCO. On or about August 25, 2000, Smith approved the disbursement of $170 million for AIRCO's investment in Capco and $19 million for AIGCC to lend to the purported investors.

21

67.     Throughout the planning and implementation of the Capco transactions,

Greenberg was kept informed. For example, in November 2000, the AIG official who devised and implemented the Capco structure advised Greenberg that the "cash has been transferred into the [Capco] structure and is shown on our balance sheet as assets." He also told Greenberg that the losses would be recognized in future periods: "The expectation is that as losses develop and are recovered from the reinsurer, a capital loss will be recognized." Both Greenberg and Smith knew from the outset that Capco would lose almost all its money as planned.

68.     As a result of the fraudulent Capco transactions, AIG's Forms 10-Q for the quarters ended September 30, 2000 (signed by Smith and filed on November 14, 2000), March 31, 2001 (signed by Smith and filed on May 15, 2001), June 30, 2001 (signed by Smith and filed on August 14, 2001), and September 30, 2001 (signed by Smith and filed on November 14, 2001) materially overstated adjusted underwriting profit for AIG's general insurance segment by $59 million or about 44 percent, $21 million or about 9 percent, 18 million or about 8 percent, and $31 million or about 14 percent, respectively. AIG's Form 10-K for the year ended December 31, 2000 (signed by Greenberg and Smith and filed on April 2, 2001) also materially overstated general insurance adjusted underwriting profit for the full year by $90 million or about 13 percent. AIG's Form 10-K for the year ended December 31, 2001 (signed by Greenberg and Smith and filed on April 1, 2002) also materially overstated general insurance adjusted underwriting profit for the full year by $83 million or about 11 percent (excluding the losses associated with the World Trade Center attacks). When Greenberg and Smith reviewed and signed these filings, they knew that they incorporated the Capco transactions.

69.     The material misstatements resulting from the Capco transactions were repeated in subsequent filings with the Commission that Smith signed or that both he and Greenberg

signed. Specifically, the third quarter 2000 material misstatements were repeated in AIG's Form

10-Q for the third quarter of 2001 (signed by Smith and filed on November 14, 2001). The first

quarter 2001 material misstatements were repeated in AIG's Form 10-Q for the first quarter of

2002 (signed by Smith and filed on May 15, 2002). The second quarter 2001 material

misstatements were repeated in AIG's Form 10-Q for the second quarter of 2002 (signed by

Smith, certified by Greenberg and Smith, and filed on August 8, 2002). The third quarter 2001

material misstatements were repeated in AIG's Form 10-Q for the third quarter of 2002 (signed

by Smith, certified by Greenberg and Smith, and filed on November 14, 2002). The material

misstatements in the 2000 Form 10-K were repeated in AIG's 2001 Form 10-K (signed by

Greenberg and Smith and filed on April 1, 2002). The material misstatements in both the 2000

and 2001 Forms 10-K were repeated in AIG's 2002 Form 10-K (signed and certified by

Greenberg and Smith and filed on March 31, 2003). In addition, AIG's 2003 Form 10-K (signed

and certified by Greenberg and Smith and filed on March 15, 2004) contains a table that includes

the materially misstated annual figures for adjusted underwriting profit for the years 2000 and

2001. When Greenberg and Smith reviewed and signed these filings, they knew that they

included the Capco transactions.

70.     Greenberg and Smith signed the 2001 management representation letter to AIG's

external auditors. This letter, dated February 6, 2002, contained material misrepresentations

concerning the Capco transaction, including a statement that all related party transactions were

properly accounted for and disclosed even though they knew that the non-recourse "loans" to the

private investors in Capco were financed by AIG.

71.     In AIG's 2000 and 2001 Forms 10-K, which both Greenberg and Smith signed,

and the company's Forms 10-Q for the first three quarters of 2001, which Smith signed, AIG

stated that it "believes that underwriting profit is the true measure of the performance of the core business of a general insurance company." In these periodic reports AIG then described the underwriting profits in each reporting period and attributed the company's success in this regard primarily to its "disciplined underwriting." Similarly, in the conference call for the year end results for 2000 on February 12, 2001, and in the press release for the second quarter of 2001, Greenberg stressed AIG's "underwriting discipline" and noted that underwriting profit is central to AIG's basic business. All these statements were materially inaccurate because, as a result of the improper Capco transactions, AIG's underwriting profit for AIG's general insurance segment was materially misstated.

## III.    NII Transactions

72.    Net Investment Income, or NII, is important to insurance companies such as AIG because they subsidize their insurance operations with income or gains derived from the investment of their insurance premiums.

73.    In mid-2000, AIG created an informal committee to develop and oversee the execution of transactions that would increase the company's reported NII. Although Smith appointed an employee in AIG's market risk management department as the nominal head of the NII enhancement committee, as it came to be known, Smith was really in charge of the committee and set its agenda.

74.    At the direction of Smith, and with his knowledge and approval, the NII enhancement committee devised economically senseless transactions in order to increase improperly NII in particular reporting periods. These were: (1) the covered calls transactions; and (2) the hedge fund transactions. These transactions involved the transfer of AIG's interest in an investment coupled with AIG's right to reacquire that investment. In the covered calls

24

transactions, AIG had the unilateral right to cause the buyer of municipal bonds owned by AIG to return the very same bonds to AIG. Similarly, in the hedge fund transactions, AIG purportedly redeemed its interest in certain hedge funds while agreeing with the hedge fund manager to immediately reinvest the amounts redeemed.

75. Smith knew or recklessly disregarded that recording NII on these transactions was not in conformity with GAAP. SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities*, ¶ 9(c), states that a transfer of financial assets shall be accounted for as a sale only if, among other things, the transferor does not maintain effective control over the transferred assets through either "(1) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity . . . or (2) the ability to unilaterally cause the holder to return specific assets, other than through a cleanup call." Because AIG retained or reacquired the rights to these assets at the time of the transactions, AIG should not have treated the transactions as sales and should not have recognized any NII, as Smith knew or recklessly disregarded.

## A. The Covered Calls Transactions

76. At Smith's direction, AIG entered into fraudulent covered calls transactions in the second half of 2001 that improperly recognized unrealized appreciation in its municipal bond portfolio as realized NII. As a result, AIG's financial statements materially overstated net investment income for AIG's general insurance segment by $60 million, or 9 percent, for the third quarter of 2001, by $86 million, or 13 percent, for the fourth quarter of 2001, and by $146 million, or 5.3 percent for the 2001 fiscal year.

77. The structure of the covered calls transactions was originally proposed in or around June 2000. Although Smith knew or recklessly disregarded that AIG's accounting for

25

these transactions would not be in conformity with GAAP and that the transactions made no economic sense for AIG, Greenberg and Smith wanted the program to proceed because AIG needed to increase its NII to meet analysts' expectations.

78.     The covered calls transactions concerned certain municipal bonds held in the investment portfolios of AIG's insurance subsidiaries. The bonds had market values above their cost basis (that is, the price AIG had paid to acquire the bonds originally). Thus, if AIG sold the bonds, it should have realized a substantial capital gain.

79.     The bonds, however, had relatively high interest rates and were valuable components of the insurance subsidiaries' investment portfolios. The covered calls transactions were designed so that AIG could purportedly achieve both goals: selling the bonds to realize the gain (but characterizing it as NII), while simultaneously ensuring that the same bonds were returned to its investment portfolio after the purported sale.

80.     As a first step, AIG effectively sold the bonds by writing call options on them with the exercise price on the options set at AIG's cost basis for the bonds. These call options were said to be "covered" because AIG owned the underlying securities, the municipal bonds. Since the market value of the bonds greatly exceeded the bonds' cost basis, the buyers of the call options could acquire the bonds at far less than their market value by exercising their option within the thirty-day period before their expiration. Since the options were deep "in the money" at the time AIG sold them it was certain that the buyers would exercise their options to buy the bonds.

81.     AIG also set the premium (that is, the price the purchaser paid to acquire the option) at the difference between the appreciated value of the bond and its cost basis. AIG then recorded the entire premium as NII. This was not in conformity with GAAP. SFAS No. 133,

26

*Accounting for Derivative Instruments and Hedging Activities*, specifically requires that the premium received in derivative transactions like these be recorded as a liability, and that only changes in the value of that liability may be recognized currently in earnings. Under SFAS No. 133, AIG should have recorded the premium as a liability at the time of the transaction – not as NII – and AIG should have recognized as income only the changes in value of the options over the life of the call option.

82.     Smith approved recording the premium as NII although he knew or recklessly disregarded that this was not in conformity with GAAP.

83.     As a second step, when AIG sold the call options a non-insurance subsidiary of AIG known as AIG Financial Products ("AIGFP") entered into contingent forward purchase agreements to buy the bonds back. Promptly after the execution of the repurchase agreements, AIGFP assigned the repurchase agreements to the AIG insurance subsidiaries that were the original holders of the bonds, completing the round trip. Smith knew these details of the transaction and they were discussed in NII enhancement committee meetings.

84.     Smith knew or recklessly disregarded that under GAAP profit from the sale of a security should not be recognized if the seller has the "ability to unilaterally cause the [buyer] to return specific assets . . . ." SFAS No. 140, at ¶ 9(c).

85.     As a result of the fraudulent covered calls transactions, AIG's financial statements for the quarter ended September 30, 2001 (signed by Smith and filed on November 14, 2001) materially overstated net investment income for AIG's general insurance segment by $60 million or 9 percent. AIG's Form 10-K for the year ended December 31, 2001 (signed by Smith and filed on March 31, 2002) also materially overstated general insurance net investment income for the fourth quarter of 2001 by $86 million or 13 percent, and for the full year by $146 million or

5.3 percent. The third quarter 2001 material misstatements were repeated in AIG's Form 10-Q

for the third quarter of 2002 (signed by Smith, certified by Greenberg and Smith, and filed on

November 14, 2002). The fourth quarter 2001 material misstatement and the 2001 annual

material misstatement were repeated in AIG's 2002 Form 10-K (signed and certified by

Greenberg and Smith and filed on March 31, 2003), as well as in AIG's 2003 Form 10-K (signed

and certified by Greenberg and Smith and filed on March 15, 2004).

> 86.    In addition, AIG's 2001 Form 10-K falsely stated:

> > In addition to hedging activities, AIG also uses derivatives instruments
> > with respect to investment operations, which include, among other
> > things, writing option contracts, and purchasing investments with
> > embedded derivatives, such as equity linked notes and convertible
> > bonds. All changes in the market value of these derivatives are recorded
> > in earnings. . . . Purchases of securities under agreements to resell and
> > sales of securities under agreements to repurchase are accounted for as
> > collateralized lending transactions. . . .

This statement was false and misleading, as Smith knew or recklessly disregarded, because

(1) the entire call premium was recorded as NII (not just the change in value, which would have

been zero or close to zero because of the short time frame of the options); and (2) the purported

sale of the bonds related to the options was not recorded as a "collateralized lending transaction."

Nevertheless, Smith signed AIG's 2001 Form 10-K.

> 87.    Smith also made material misrepresentations to AIG's external auditors in the

2001 management representation letter dated February 6, 2002. Specifically, the letter stated

falsely that "[a]greements to repurchase assets previously sold" had been properly recorded and

disclosed in the financial statements even though the true nature of the contingent forward

purchase agreements was not disclosed. It also represented falsely that AIG had evaluated all

contracts and derivative instruments to ensure conformity with SFAS No. 133, even though the

covered calls transactions were not accounted for properly under this accounting principle.

Finally, the letter falsely represented that AIG's consolidated financial statements were prepared in accordance with GAAP, and that there had been no fraud involving management or violations of laws or regulations. The management representation letter for AIG's 2002 financial statements, dated February 12, 2003, which Smith also signed, contains similar material misrepresentations.

## B.    Improper Transactions with Hedge Funds

88.    Smith participated in another set of transactions to improperly recognize unrealized appreciation in AIG's investment in certain hedge funds in 2001. At AIG, the unrealized appreciation was routinely referred to as "banks." In these transactions, the income was recognized when there was either (1) no receipt of cash from the hedge fund; or (2) a "round trip" transaction in which AIG secretly agreed to return money received from the hedge fund. Not only did AIG fraudulently purport to realize NII gains through the round trips at the end of its 2001 fiscal year, but it also fraudulently accrued a portion of them in the second and third quarters of 2001. As a result of the fraudulent hedge fund transactions, AIG's financial statements materially overstated net investment income by $104 million or 17.3 percent for the quarter ended June 30, 2001, by $133 million or 22.5 percent for the quarter ended September 30, 2001, and by $165 million or 6.1 percent for the 2001 fiscal year.

89.    AIG accounted for its investments in hedge funds under the cost method. Under this method, AIG could recognize NII only when the hedge funds distributed income to AIG and to other investors or when AIG redeemed its investment in the hedge fund.

90.    But AIG did not wait for these events to occur. Instead, at the end of the second and third quarters of 2001, AIG accrued $104 million and $133 million in NII from its investment in hedge funds, even though AIG did not receive any distributions from the hedge

funds and did not redeem its investments in the hedge funds during those quarters. AIG recorded the accruals in the specific amounts that AIG needed to meet analysts' expectations for AIG's NII in those quarters. Smith approved the journal entries for these accruals when he knew, or recklessly disregarded, that they were improper.

91. The amounts of the quarterly accruals had no relationship to the actual amount of unrealized appreciation in the hedge fund investments during the relevant quarters. The accrual amounts recorded were designed to meet Greenberg's target for growth in NII over the same quarters in the prior year.

92. The unrealized appreciation in AIG's hedge fund investments was part of a system of "banks" that AIG and Smith would draw upon as needed, without regard to GAAP. Other senior AIG personnel warned that this could not continue indefinitely because eventually the "banks" would be depleted and there would be no unrealized hedge fund gains left to "harvest."

93. At the end of 2001, in an attempt to mask its improper quarterly accruals, AIG engaged in "round trip" transactions with the hedge funds. AIG requested that certain hedge funds send it an amount of money equal to, or slightly less than, AIG's estimate of its unrealized appreciation in the hedge fund. At the same time the hedge fund sent AIG the money, AIG agreed that it would return the money to the hedge fund shortly after receipt. With Smith's approval, AIG then recorded the amount received as NII, which was not in conformity with GAAP.

94. Some hedge funds did not participate in these transactions and AIG was able to generate only a total of $165 million from round trips with hedge funds, still substantially less than the $237 million AIG had accrued in the second and third quarters. Smith approved

30

recording the $165 million as NII in the fourth quarter of 2001 and reversing the accruals that it had taken in the second and third quarter. Nevertheless, because of the shortfall AIG did not meet Greenberg's target for NII.

95.     Moreover, the $165 million in investment gain that AIG recorded in the fourth quarter included gain from hedge funds that did not have sufficient liquidity to engage in a round trip with AIG. In those instances, AIG loaned money to the hedge fund to enable the fund to send the money back to AIG. Smith was aware of, and approved, these loans.

96.     As a result of the fraudulent hedge fund transactions, AIG's financial statements for the quarter ended June 30, 2001(signed by Smith and filed on August 14, 2001) materially overstated general insurance net investment income by $104 million or 17.3 percent. AIG's financial statements for the quarter ended September 30, 2001 (signed by Smith and filed on November 14, 2001) materially overstated general insurance net investment income by $133 million or 22.5 percent. In the fourth quarter these accruals were reversed, and AIG recorded a gain of $165 million as a result of hedge fund transactions. The round trip transactions resulted in a $165 million or 6.1 percent material overstatement of 2001 net investment income from general insurance operations in AIG's Form 10-K for the year ended December 31, 2001 (signed by Greenberg and Smith and filed on April 1, 2002). The second quarter 2001 material misstatements were repeated in AIG's Form 10-Q for the second quarter of 2002 (signed by Smith, certified by Greenberg and Smith, and filed on August 8, 2002); the third quarter 2001 material misstatements were repeated in AIG's Form 10-Q for the third quarter of 2002 (signed by Smith, certified by Greenberg and Smith, and filed on November 14, 2002); and the material misstatements in AIG's 2001 Form 10-K were repeated in AIG's 2002 Form 10-K (signed and

31

certified by Greenberg and Smith and filed on March 31, 2003), as well as in AIG's 2003 Form 10-K (signed and certified by Greenberg and Smith and filed on March 15, 2004).

97.     Smith also made material misrepresentations to AIG's external auditors in the 2001 management representation letter dated February 6, 2002 in which he stated falsely that "[a]greements to repurchase assets previously sold" had been properly recorded and disclosed in the financial statements even though the true nature of the round trip agreements was not disclosed.

## C.     False Statements Regarding NII

98.     From 2000 to the first quarter of 2002, AIG reported that NII continued to grow at AIG as it had for approximately twenty years. In particular, AIG reported that NII increased approximately 7 percent each quarter when compared to the same quarter one year earlier.

99.     In the second quarter of 2002, however, AIG's reported NII declined for the first time in twenty years. In AIG's second quarter 2002 earnings press release dated July 25, 2002, which Greenberg and Smith reviewed beforehand and whose issuance Greenberg approved, Greenberg stated: "lower net investment income [was] attributable primarily to market and credit conditions . . . . [L]ower interest rates and declining equity markets have reduced investment and asset management income. . . ." Greenberg continued that AIG was "sacrificing yield for quality" and said that the "primary" reason for the reported decline in NII was due to "lower earnings from our private equity portfolio. *There has been a paucity of IPO activity in the market.*" (Emphasis added.) Greenberg made similar statements during the second quarter investor conference call on July 25, 2002.

100.    These statements were materially inaccurate. The reported decline in NII was not attributable to a "paucity of IPO activity," as Greenberg said in the press release and in the

32

July 25, 2002 conference call, but rather to improper transactions and book entries in 2001 that did not occur again in 2002.

101.    Specifically, Greenberg was aware that the reported decline in NII was primarily attributable to the lack of any hedge fund accruals in the second quarter of 2002. He had previously learned that the NII budgets for 2001 and 2002 would decline against the expected results for 2000, that available "banks," such as the unrealized gains in the hedge fund investments, would be exhausted, and that non-recurring transactions would be required in the future to meet the shortfall. By the second quarter of 2002, AIG no longer had any hedge fund gains to harvest.

102.    Moreover, Smith had previously advised Greenberg about the true contributors to reported NII in 2001, showing him that the reported decline in "partnership and private equities income" (a component of NII) from the second quarter of 2001 to the second quarter of 2002 was due to $104 million in hedge fund accruals in the second quarter of 2001.

103.    Similar materially inaccurate statements appear in the third quarter 2002 earnings press release dated October 24, 2002, which Greenberg and Smith reviewed beforehand and whose issuance Greenberg approved.

104.    In addition, both press releases attributed the reported decline in NII partly to reinvestments of maturing fixed income securities at lower interest rates. In fact, the reported decline in NII was due not to reinvestments of maturing fixed income securities at lower interest rates but to the termination of the covered calls program in 2001, with the result that the NII derived from that program was not available in 2002.

105.    Greenberg and Smith reviewed and commented on AIG's earnings releases and Greenberg worked closely with AIG staff who drafted the releases, especially on quotations

33

attributed to Greenberg in the releases. AIG's earnings releases were issued only after

Greenberg reviewed and approved them.

106.    Greenberg and Smith repeated the statements regarding the reported decline in

NII in the investor conference calls for the second and third quarter of 2002 on July 25, 2002 and

October 24, 2002, respectively. In Greenberg's opening statement for the second quarter call, he

stated:

> Investment income [NII] on the domestic property and casualty
> [General Insurance] was down in the quarter, for really virtually
> only one reason. We have roughly- the majority of our investment
> income is interest and dividends, but we do have a private equity
> portfolio, and there is simply a paucity of IPO's [sic] in the quarter.

This statement by Greenberg was materially inaccurate.

107.    In the question and answer session during the second quarter call, an analyst

asked about the reported decline in NII: "[W]hy there was a large contrast between the

decline . . . in overall property/casualty investment income compared to the overall growth in life

insurance investment income?" In response, Greenberg reiterated that there was a lack of IPO

activity within the property/casualty [general] insurance segments private equity investments.

He did not mention the hedge fund accruals. After a follow-up question about the impact of the

swing on the property/casualty private equity portfolios quarter over quarter, Smith responded:

"[I]f you focus on partnership and private equity income, it will give you some idea of the

numbers. In the first quarter of 2002, the number was north of $100 million and basically in this

quarter it was flat." But his response was misleading because Smith did not compare the second

quarter of 2002 to the second quarter of 2001, as AIG's press release had, and even though Smith

knew or recklessly disregarded that there had been a similar pattern in 2001 with private equities

34

generating in excess of $100 million in the first quarter and none in the second quarter of that year.

108.    The reported decline in NII from the second quarter of 2001 to the second quarter of 2002 had nothing to do with private equities and IPO activity. It was caused by the improper accruals of $104 million of income from hedge funds in the second quarter of 2001 and the lack of such accruals in the second quarter of 2002. The reported decline in NII in the second quarter of 2002 when compared with the same quarter in 2001 was 4 percent. But when the improper hedge fund accruals are excluded, as they should have been, the true change in NII was a 13 percent increase. Similarly, the reported decline in NII in the third quarter of 2002 when compared with the same quarter of 2001 was 9 percent but the true change was a 24 percent increase.

109.    In the conference call for the third quarter of 2002, Greenberg said in the opening statement: "Net investment income was down...as we said in the second quarter conference call, private equity and partnership income has been very disappointing . . . there have been very [few] IPOs and as a result, very little flowing through to investment income. . . ." This statement was materially inaccurate. Further, in response to questions from analysts regarding NII during the call, Greenberg repeated the materially inaccurate lack-of-IPOs rationale and omitted the true reason.

110.    AIG's Forms 10-Q for the second and third quarters of 2002 were similarly false and misleading about the reasons for the reported decline in NII. Both quarterly reports stated, "The growth in net investment income in 2002 has slowed significantly primarily as a result of lower earnings from the general insurance private equity portfolio. Also, interest income earned from the general insurance bond portfolio was impacted by lower yields as the proceeds from

35

maturing fixed income securities are reinvested." In fact, the reported change in NII was caused primarily by improper transactions and book entries in 2001 that did not occur again in 2002. Smith signed, and Greenberg reviewed, approved, and certified the Form 10-Q for the second quarter of 2002. Smith signed, and Greenberg reviewed, approved, and certified the Form 10-Q for the third quarter of 2002.

## IV.    The Purported Sales of Municipal Bonds to AIG-Controlled Trusts

111.    The transactions involving the Muni Tobs were somewhat different from the covered calls and hedge fund transactions but the ultimate outcome was similar: AIG purported to sell certain of its securities in order to recognize capital gains while at the same time retaining its rights to the securities.

112.    In the Muni Tobs transactions, AIG transferred tax exempt municipal bonds to an investment bank that immediately deposited the bonds into a trust. The trust then issued two types of securities: floating rate certificates and inverse floating rate residual certificates. The trust sold the floating rate certificates to institutional investors and the proceeds of the sale went to AIG; and the trust issued the inverse residual certificates to AIG. AIG then called the certificates, collapsed the trust, and got back its municipal bonds.

113.    AIG's retention of the right to re-acquire the bonds – the lack of a true sale – made the recognition of capital gains not in conformity with GAAP. SFAS No. 125, *Accounting for Transfers and Servicing of Financial Assets* (1996), ¶ 9(c) and SFAS No. 140 at ¶ 9(c) (each prohibiting recognition of the sales of the bonds to the trust because of AIG's unilateral ability to collapse the trust and thus secure the return of the bonds). SFAS No. 140 was effective for transfers after March 31, 2001. In 2000 and 2001, AIG was also required to consider the guidance in EITF Issue No. 84-15, *Grantor Trusts Consolidation* (1984) (listing criteria to be

considered in determining whether a transaction between a company and a grantor trust established by the company should result in revenue recognition and whether the trust should be consolidated, including, *inter alia*, the amount of outside equity in the trust, the extent of the company's influence over the trust, and the identity of the trust beneficiary).

114.    Smith was involved in, and approved, these transactions from the outset. He also approved recording capital gains on the transactions when he knew or recklessly disregarded that doing so was not in conformity with GAAP.

115.    As a result of the improper recognition of realized capital gains from the fraudulent Muni Tobs transactions, AIG's Form 10-Q for the quarter ended June 30, 2001 (signed by Smith and filed on August 14, 2001) materially understated general insurance realized capital losses by $46 million or 55.5 percent; its Form 10-Q for the quarter ended September 30, 2001 (signed by Smith and filed on November 14, 2001) materially understated general insurance realized capital losses by $83 million or 48 percent; and its 2001 Form 10-K (signed by Greenberg and Smith and filed on March 31, 2002) materially understated general insurance realized capital losses by $205 million or 61.3 percent. The second quarter 2001 material misstatements were repeated in AIG's Form 10-Q for the second quarter of 2002 (signed and certified by Greenberg and Smith and filed on August 8, 2002); the third quarter 2001 material misstatements were repeated in AIG's Form 10-Q for the third quarter of 2002 (signed by Smith, certified by Greenberg and Smith, and filed on November 14, 2002); and the material misstatements in the 2001 Form 10-K were repeated in AIG's 2002 Form 10-K (signed and certified by Greenberg and Smith and filed on March 31, 2003), as well as in AIG's 2003 Form 10-K (signed and certified by Greenberg and Smith and filed on March 15, 2004).

## V.    Aggregate Effect on Net Income of the Fraudulent Transactions

116.    In addition to the particular line item misstatements that resulted from the various transactions described above, net income for particular reporting periods also was materially misstated in the aggregate. Specifically, reported net income was overstated by approximately 6 percent for the second quarter of 2001; and by approximately 127 percent for the third quarter of 2001; by approximately 6 percent for the year ended December 31, 2001. In addition, core net income as defined by AIG was overstated by approximately 12 percent for the third quarter of 2001. All of these aggregate misstatements were repeated in later filings.

### FIRST CLAIM FOR RELIEF
### Greenberg's and Smith's Control Person Liability for AIG's Violations of Section 10(b) of the Exchange Act and Rule 10b-5

117.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 116.

118.    AIG, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, singly or in concert, knowingly or recklessly, employed devices, schemes, or artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

119.    Greenberg, directly or indirectly, controlled AIG at the time of AIG's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] and he was a culpable participant in these violations.

38

120.    Smith, directly or indirectly, controlled AIG at the time of AIG's violations of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

and he was a culpable participant in these violations.

121.    By reason of the foregoing, Greenberg and Smith are liable as control persons for

AIG's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

[17 C.F.R. § 240.10b-5], pursuant to Section 20(a) of the Exchange Act [15 C.F.R. § 78t(a)].

## SECOND CLAIM FOR RELIEF
### Smith's Violations of Section 17(a)(1) of the Securities Act

122.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 116.

123.    Smith, in the offer or sale of securities, by the use of the means or instruments of

transportation and communication in interstate commerce or by the use of the mails, directly or

indirectly, singly or in concert, has employed or is employing devices, schemes, and artifices to

defraud.

124.    By reason of the foregoing, Smith violated, and unless enjoined will again violate,

Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## THIRD CLAIM FOR RELIEF
### Smith's Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act

125.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 116.

126.    Smith, in the offer or sale of securities, by the use of the means or instruments of

transportation or communication in interstate commerce or by the use of the mails, directly or

indirectly, singly or in concert, has obtained money and property by means of untrue statements

of material fact or omissions to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading, or has engaged

39

in transactions, practices, or courses of business which have operated or would operate as a fraud and deceit upon purchasers.

127.    By reason of the foregoing, Smith violated, and unless enjoined will again violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## FOURTH CLAIM FOR RELIEF
### Smith's Violations of Section 10(b) of the Exchange Act and Rule 10b-5

128.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 116.

129.    Smith, in connection with the purchase or sale of securities, by the use of the means and instrumentalities of interstate commerce or of the mails, directly or indirectly, singly or in concert, have employed devices, schemes, and artifices to defraud; have made untrue statements of material fact and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged in acts, practices, and courses of business which have operated or would operate as a fraud and deceit upon investors.

130.    By reason of the foregoing, Smith has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## FIFTH CLAIM FOR RELIEF
### Smith's Violations of Section 13(b)(5) of the Exchange Act

131.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 116.

132.    Smith, directly or indirectly, singly or in concert, knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified

40

books, records, or accounts of AIG that were subject to Section 13(b)(2)(A) of the Exchange Act

[15 U.S.C. § 78m(b)(2)(A)].

133.    By reason of the foregoing, Smith has violated, and unless enjoined will again

violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## SIXTH CLAIM FOR RELIEF
### Smith's Violations of Rule 13b2-1 of the Exchange Act

134.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 116.

135.    Smith, directly or indirectly, singly or in concert, falsified or caused to be falsified

books, records, or accounts of AIG that were subject to Section 13(b)(2)(A) of the Exchange Act

[15 U.S.C. § 78m(b)(2)(A)].

136.    By reason of the foregoing, Smith has violated, and unless enjoined will again

violate, Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

## SEVENTH CLAIM FOR RELIEF
### Smith's Violations of Rule 13b2-2 of the Exchange Act

137.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 116.

138.    Smith was an officer and director of AIG at all relevant times.

139.    As described above, Smith, directly or indirectly, singly or in concert, made or

caused to be made materially false or misleading statements, or omitted to state or caused

another person to omit to state material facts necessary in order to make the statements made, in

light of the circumstances under which such statements were made, not misleading to an

accountant, in connection with (i) audits, reviews, or examinations of the financial statements of

41

AIG required to be made pursuant to Commission regulations, and (ii) the preparation or filing by AIG of documents and reports required to be filed with the Commission.

140.    By reason of the foregoing, Smith has violated, and unless enjoined will again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

### EIGHTH CLAIM FOR RELIEF
### Smith's Violations of Rule 13a-14 of the Exchange Act

141.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 116.

142.    As described above, AIG failed to file with the Commission such financial reports as the Commission has prescribed, and AIG did not include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

143.    Smith certified AIG's Forms 10-K for the year ended December 31, 2002 (filed on March 31, 2003) and for the year ended December 31, 2003 (filed on March 15, 2004).

144.    Smith certified AIG's Forms 10-Q, as follows: (i) for the quarter ended September 30, 2002 (filed on November 14, 2002); (ii) for the quarter ended March 31, 2003 (filed on May 14, 2003); (iii) an amended Form 10-Q for the quarter ended March 31, 2003 (filed July 18, 2003); (iv) for the quarter ended June 30, 2003 (filed on August 14, 2003); (v) for the quarter ended September 30, 2003 (filed on November 14, 2003); (vi) for the quarter ended March 31, 2004 (filed on May 10, 2004); (vii) for the quarter ended June 30, 2004 (filed on August 9, 2004); and (viii) for the quarter ended September 30, 2004 (filed on November 9, 2004).

42

145.    Smith was AIG's principal financial officer at the time he certified each of the

foregoing filings.

146.    Smith knew or reasonably should have known or recklessly disregarded that his

certifications of the foregoing filings were materially false and misleading.

147.    By reason of the foregoing, Smith has violated, and unless enjoined will again

violate, Rule 13a-14 [17 C.F.R. § 240.13a-14].

### NINTH CLAIM FOR RELIEF
### Greenberg's and Smith's Control Person Liability for AIG's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13

148.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 116.

149.    In violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules

12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13], AIG did not

file with the Commission such financial reports as the Commission has prescribed, and AIG did

not include, in addition to the information expressly required to be stated in such reports, such

further material information as was necessary to make the statements made therein, in light of the

circumstances in which they were made, not misleading.

150.    Greenberg controlled AIG at the time of AIG's violations of the foregoing

provisions and was a culpable participant in AIG's violations of them.

151.    Smith controlled AIG at the time of AIG's violations of the foregoing provisions

and was a culpable participant in AIG's violations of them.

152.    By reason of the foregoing, Greenberg and Smith are liable for AIG's violations

of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13

[17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

43

**TENTH CLAIM FOR RELIEF**
**Greenberg's and Smith's Control Person Liability for AIG's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**

153.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 116.

154.    In violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, AIG did not:

a.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and

b.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

i.    transactions were executed in accordance with management's general or specific authorization;

ii.    transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

iii.    access to assets was permitted only in accordance with management's general or specific authorization; and

iv.    the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

155.    Greenberg controlled AIG at the time of AIG's violations of the foregoing provisions of the Exchange Act and was a culpable participant in AIG's violations of them.

156.    Smith controlled AIG at the time of AIG's violations of the foregoing provisions and was a culpable participant in AIG's violations of them.

157.    By reason of the foregoing, Greenberg and Smith are liable for AIG's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Greenberg and Smith, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5].

### II.

Permanently enjoining Greenberg and Smith, their agents, servants, employees, and attorneys, and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from controlling any person who violates Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

### III.

Permanently enjoining Smith, his agents, servants, employees, and attorneys, and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)] and Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13a-14, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.13a-14, 240.13b2-1, and 240.13b2-2].

### IV.

Ordering Greenberg and Smith to disgorge any ill-gotten gains from the conduct alleged herein.

### V.

Imposing civil penalties on Greenberg pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and on Smith pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VI.

Barring Smith, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] for a period of three years from the date of entry of the final judgment.

## VII.

Granting such other and further relief as to this Court seems just and proper.

Dated:  New York, New York
       August 6, 2009

By: _____
     George S. Canellos

Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center
New York, NY  10281-1022
(212) 336-0174

Of Counsel:

Andrew M. Calamari
Robert J. Keyes
Ken C. Joseph
David Stoelting
Michael D. Paley
Eduardo A. Santiago-Acevedo
Lara Mehraban

47